IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention of D.S., Appellant. | No. 88050-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |
| --- | --- |

CHUNG, J. — A trial court found D.S. was gravely disabled because she was in danger of serious physical harm resulting from a failure to provide for her essential human needs of health or safety and granted a petition for a 14-day involuntary commitment pursuant to the Involuntary Treatment Act (ITA), chapter 71.05 RCW. On appeal, D.S. challenges her commitment, arguing there was not substantial evidence to support the court's finding that she was gravely disabled. We agree and reverse.

BACKGROUND

On February 5, 2025, D.S., a 28-year-old woman, went to Seattle-Tacoma airport and stood in a security line without a boarding pass. D.S. was "acting very bizarre" when contacted by security, and Emergency Medical Services (EMS) took her from the airport to St. Anne Hospital Emergency Department (St. Anne).

Upon intake at St. Anne's, D.S. was described as "extremely agitated" and "screaming and yelling tangentially, not answering questions consistently." She denied any suicidal or homicidal ideations. The staff ordered behavioral restraints, as D.S. "demonstrated violent behavior . . . including confusion,

agitation, climbing out of bed, posing a fall risk, inability to follow directions." The staff attempted alternatives to restraints, which "failed due to patient's inability to follow directions," and she was "[p]laced in seclusion for violent physically aggressive behavior." One nurse noted that D.S. "voluntarily asked to come to the hospital."

That evening, a St. Anne Social Services Specialist, Diana Wairimu, met with D.S to conduct a mental health evaluation. At that point, D.S. "was found resting calmly and unrestrained." D.S. again denied suicidal and homicidal ideation as well as auditory and visual hallucinations." When Wairimu asked if D.S. was able to open her eyes, D.S. let out a yell for five seconds, then used "appropriate voice level of speaking and did not yell again during evaluation." D.S. "reported that she was at the airport with plans to fly to Hawaii"; specifically, that "she was in search of records and was to meet 'Governor [I]ge' of Hawaii." D.S. stated that she lives alone in an apartment, is employed by Ben Bridge Jeweler, "is enrolled in metaphysics studies at university and is a 'scholar of grief.' " At that time, Wairimu determined D.S. "continue[d] to present as [a] danger to self," could not voluntarily accept inpatient psychiatric treatment, but was "too impaired to discharge," so she was referred to the designated crisis responder (DCR) for evaluation.

The next day, D.S. was admitted to Navos Hospital ("Navos"). Upon arrival, D.S. "[i]mmediately asked to be discharged so that she can, quote, 'fly out to Hawaii to meet with the prince and start a nonprofit organization,' unquote." However, she "verbally agreed to remain safe to self and others" and was "able

2

to make [her] needs known." In her initial psychosocial evaluation, D.S. presented with "elevated mood, expansive affect, adequate hygiene, hyperverbal speech, delusional and grandiose thought content, and circumstantial thought process" and was "speaking rapidly and in a pressured manner that was difficult to follow." She "reported she was working on advocating for Hawaiian sovereignty and explained that she has gone to school for metaphysics and feels she was meant to assist in this cause." The evaluating social worker noted that D.S. "presented absence of any insight into her current presentation and conditions, but did endorse ongoing treatment . . . with a psychiatrist and therapist."

On February 10, the DCR petitioned for 14-day involuntary treatment at Navos, arguing that D.S. was gravely disabled and presented a likelihood of serious harm to herself. At the hearing, held on February 13, the State presented two witnesses: Susan Surdez, who testified as records custodian for St. Anne's, and Timothy Miller, who testified as the court evaluator on behalf of Navos and offered a working diagnosis of "bipolar disorder, current episode manic, with psychotic features." D.S. also testified.

The court found D.S. gravely disabled under "Prong A" of RCW 71.05.240[1] and determined a less restrictive alternative was not in D.S.'s best interest. D.S. timely appeals.

---

[1] The form findings of fact and conclusions of law ordering involuntary treatment or commitment uses the term "Prong A" to refer to the definition of "gravely disabled" in RCW 71.05.020(25)(a).

DISCUSSION

The ITA allows a person to be involuntarily committed for treatment of behavioral health disorders.[2] In re Det. of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986). While a behavioral health disorder alone is not enough to permit the significant deprivation of liberty of involuntary commitment, id. at 201, a court can order commitment for involuntary treatment if the person poses a likelihood of serious harm or is gravely disabled. RCW 71.05.240(4)(a).

The ITA defines "gravely disabled" in two distinct, alternative ways, often referred to as "Prong A" and "Prong B":

> [A]s a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety.

RCW 71.05.020(25). Further, before a court can order an individual to be committed to a licensed treatment facility based on a finding that a person is gravely disabled, it must also consider whether any less restrictive alternatives to involuntary detention are in the best interests of "such person or others." RCW 71.05.240(4)(a).

For a 14-day commitment due to grave disability, the State must prove that a person is gravely disabled by a preponderance of the evidence. Id. On

---

[2] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

appeal, we review whether substantial evidence supports a trial court's findings of fact and whether those findings support its conclusions of law. LaBelle, 107 Wn.2d at 209. Substantial evidence is "the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024) (quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). We review such challenges in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

Here, the trial court found D.S. "gravely disabled" under the first statutory definition, i.e., "Prong A"—that D.S. was "in danger of serious physical harm resulting from a failure or inability to provide for her essential human needs of health or safety." See RCW 71.05.020(25)(a). Based on the "credible testimony" of Surdez and Miller, the trial court found by a preponderance of evidence that D.S. "currently suffers from a behavioral health disorder with a working diagnosis of bipolar, manic with psychotic features – which has had a substantial adverse effect upon [her] cognitive and volitional functioning as evidenced by her symptoms and presentation." The court found D.S.'s testimony not credible, "specifically her interpretation of the events which le[]d to her hospitalization." Instead, the court credited the hospital's evidence that "she was at the airport in order to board a plan to Hawaii to visit the Governor, and other notable people." The court found the hospital's evidence "[met] the prong A test," specifically noting the evidence that D.S. had not engaged in planning as would be required

5

to travel to Hawaiʻi, evidence that she did not take elevated dosage of medication at her provider's request, and that she refused medication at the hospital.

On appeal, D.S. challenges the court's order for lack of sufficient evidence that she was at risk of being unable to provide for her essential needs as a result of a behavioral health disorder.[3] Specifically, as to sufficiency of evidence, D.S. argues there was no evidence a trip to Hawaiʻi would have endangered her ability to care for her essential needs, no nexus between her bipolar disorder and her desire to advocate for Hawaiian sovereignty, and the remaining evidence was insufficient to establish she was gravely disabled. We agree with D.S. that the evidence is insufficient to establish she was gravely disabled under RCW 71.05.020(25)(a).[4]

In determining whether to order involuntary treatment, courts are not confined to considering a person's condition "*at the time of the hearing*." In re Det. of C.K., 108 Wn. App. 65, 76, 29 P.3d 69 (2001).[5] Indeed, "courts can consider that person's 'prior history or pattern of decompensation and discontinuation of treatment.' " Id. at 73 (quoting RCW 71.05.285). This is because "recent past mental history is relevant in determining present and

---

[3] Appeals of involuntary commitments are not moot because the challenged order, albeit expired, "may have adverse consequences on future involuntary commitment determinations." In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012).

[4] Based on this resolution, we need not address D.S.'s alternative argument that the order unconstitutionally restricts her right to travel freely between states.

[5] For example, in C.K., C.K.'s landlord testified that "when C.K. does not take his medication, his apartment becomes a shambles and he disturbs other tenants." 108 Wn. App. at 75. C.K. argued that the court "had no authority to order treatment because he was not gravely disabled *at the time of the hearing*, during which time he was on medication and not manifesting deterioration of mental function." Id. at 76. Division Two of this court disagreed, rebutting that "C.K.'s argument contravenes the Legislature's purpose in Chapter 71.05 RCW to provide intervention *before* a patient's condition reaches 'crisis proportions.' " Id. (emphasis added) (quoting LaBelle, 107 Wn.2d at 206)).

immediate future mental behavior." In re Det. of M.K., 168 Wn. App. 621, 627, 279 P.3d 897 (2012). However, the State must "present recent, tangible evidence of failure or inability to provide for such essential human needs . . . which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." LaBelle, 107 Wn.2d at 204-05. "Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." Id. at 205. Essential needs include "food, clothing, shelter, and medical treatment." Id.

Here, the St. Anne's specialist who evaluated D.S. noted that D.S. "stated she lives alone in an apartment in Pioneer Square" and "is employed by Ben Bridge Jeweler." Miller confirmed that "there was never any concern that [D.S.] was unable to provide clothing for herself" and "she has a shelter. She has an apartment she lives in." Although D.S. had acknowledged to the DCR that "she ha[d] been eating less recently because she is on 'a 21-day fast,' " and Miller observed that D.S. had "poor sleep at times," medical notes from February 12, the day before the hearing, confirmed D.S. was "sleeping okay at night and has normal appetite."

As evidence that D.S. was gravely disabled, the trial court noted, "If D.S. was going to the airport to travel to Hawai'i, this would require planning in advance, and [D.S.] did not engage in any of this planning, which indicates a significant failure to provide for her essential needs including food, shelter, and medical treatment." At the involuntary commitment hearing, when asked specifically what was the basis for the opinion that D.S. "herself is in danger of

serious physical harm from a failure or ability to provide for her essential needs of health and safety," Miller explained,

> The lack of insight and poor judgment of continuing to desire to board a plane with actually no plan, no boarding pass to go to Hawaii; with no plan to support herself there in any way . . . . Going to an airport and trying to get through TSA without a boarding pass certainly puts herself and others at a potential danger -- a dangerous situation.
>
> And, again, if she was even to get to -- able to get to Hawaii, she has described no plan of how she is going to take care of her basic health and safety needs once she's there.

Miller further responded that if D.S. did not receive inpatient treatment for her mental disorder, the harmful consequences he foresaw were

> that she intend[ed] to board a plane to go to Hawaii with actually no means to get on the airplane and no plan of what to -- how to take care of her health and safety needs once . . . she's there. So those are two . . . consequences that place her in danger and not tending to her health and safety needs.

However, there was no evidence that D.S. would actually carry out her travel plan. Indeed, it was undisputed that D.S. had no airplane ticket. Thus, Miller's opinion as to what might occur if D.S. were to travel to Hawai'i was speculative.[6]

The trial court also noted that "[t]here was evidence that [D.S.] didn't take medication at the request of her provider when it was . . . supposed to be

---

[6] D.S. also argues that there was no evidence that her attempted travel "arose as a result of a behavioral health disorder." But the State did not argue that D.S.'s desire to advocate for Hawaiian sovereignty was a symptom of her bipolar disorder, as she claims. Rather, the evidence of symptoms of her disorder included D.S.'s behavior of standing in a TSA line without a ticket and acting "very bizarre," and that at the emergency department, she was screaming and yelling, very agitated, unable to answer questions consistently or follow directions from others, and required restraints due to violent behavior, confusion, and agitation. Miller testified that she had a mental health disorder with a working diagnosis of bipolar disorder, current episode manic, with psychotic features. At Navos, she continued to show delusional and grandiose thought content by expressing a desire "to meet with the prince."

elevated, and she refused medication at the hospital." When asked why he was not recommending a less restrictive treatment, Miller pointed to D.S.'s "lack of insight into the need for treatment . . . stating in the notes here that her outpatient provider had recommended an increase in medication, and that she did not -- did not comply with that, and only took the medication one time." The record includes some evidence that D.S. did not always comply with adjustments to her medication dosages. However, refusal of medication, without more, is not sufficient to support a finding of grave disability under RCW 71.05.020(25)(a). Here, the record also reflected that D.S. had attended outpatient therapy, appointments with a psychiatrist, and group therapy sessions. And there was no evidence that D.S.'s failure to take medication had or would result in a danger of serious physical harm resulting from failure to provide for her own essential needs. Cf., e.g., C.K., 108 Wn. App. at 75 (there was substantial evidence to support a finding of grave disability under former RCW 71.05.020(1)(a) (1979) where it was undisputed that C.K. decompensates "when he stops taking his medication" and that his decompensation caused him to become " 'threatening,' making outrageous statements . . . to other people,' " and allowing "his apartment [to] deteriorate[] to a 'horrible' condition").

The State had the burden of establishing that the failure to meet these needs placed D.S. in danger of serious physical harm. Courts have held this burden is not met when the evidence of the risk of physical harm is "too speculative and insubstantial." LaBelle, 107 Wn.2d at 214. For example, in

LaBelle, as to respondent Richardson,[7] the State argued that Richardson was

" 'at substantial risk of physical harm' " because

> (1) When Richardson was initially detained, he was suffering from a serious case of impetigo for which he would not get treatment; (2) Richardson . . . experienced intermittent pain in a tooth and had not been to the dentist in 12 years; and (3) Richardson indicated that he was not eating well before he was hospitalized but was unwilling to consider the possible consequences of that or to seek medical help.

Id. at 213-14. The court noted "the evidence indicated that the impetigo no longer required medical attention," "there was no evidence that the dental problem involved any risk of harm to Richardson," and "even if Richardson was not eating well, there was no evidence that he was in any danger therefrom." Id. at 214. Accordingly, it held that the risk of physical harm was "too speculative and insubstantial" to justify commitment "under the gravely disabled standard of [former] RCW 71.05.020(1)(a)." Id.

Similarly, in In re Det. of A.M., there was insufficient evidence to support a finding of grave disability under the first statutory definition, i.e., "Prong A." 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021). There, while the State had provided evidence that A.M. "had been refusing to eat and had been eating only intermittently from the end of June up to [his] July 15 hearing," the only evidence of potential harm was the court evaluator's "conclusory statements that AM could not meet his basic health and safety needs." Id. at 333-34. The court noted,

---

[7] As to Richardson, the LaBelle court separately addressed only his challenge to the 90-day commitment order, which requires "clear, cogent, and convincing evidence" rather than "preponderance of the evidence." Id.

"[t]here was no evidence of past or recent weight loss or any other health consequence from AM's reluctance to eat." Id. at 334.

Here, the State's evidence of health consequences resulting from D.S.'s behavior included D.S.'s testimony that she had not slept for 24 hours prior to admission to Navos, that D.S. had "poor sleep at times," and Miller's conclusory opinion that D.S. was "gravely disabled, herself in danger of serious physical harm from a failure or inability to provide for her essential needs of health and safety." But the evidence also showed that she was clothed, had shelter, and had a normal appetite. Thus, as in A.M., and as with Richardson in LaBelle, the evidence that D.S. was in danger of serious physical harm was speculative and conclusory.

## CONCLUSION

The court's determination that D.S. was gravely disabled under RCW 71.05.020(25)(a) was not supported by substantial evidence. We reverse and remand to the superior court to vacate the order concluding the evidence warranted D.S.'s detention for involuntary treatment.

_Chung, J._

WE CONCUR:

_Diwell, J._          _Mann, J._